UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHANNON WOLTE-ROTONDO,

                Plaintiff,          Civil Action No. 15-13093
                                        Honorable Nancy G. Edmunds
                                        Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [16, 18]**

      Plaintiff Shannon Wolte-Rotondo ("Rotondo") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [16, 18], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). The Court held oral argument on May 11, 2016.

**I.**      **RECOMMENDATION**

      For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Rotondo is not disabled under the Act. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [18] be GRANTED, Rotondo's Motion for Summary Judgment [16] be DENIED, and that, pursuant to sentence four of 42 U.S.C. §405(g), the ALJ's decision be AFFIRMED.

## II.    REPORT

### A.    Procedural History

On June 26, 2012, Rotondo filed an application for SSI, alleging a disability onset date of January 4, 2011.  (Tr. 167-72).  This application was denied initially on November 13, 2012.  (Tr. 103-06).  Rotondo filed a timely request for an administrative hearing, which was held on October 23, 2013, before ALJ John Pope.  (Tr. 44-93).  Rotondo, who was represented by attorney Stefani Rossi, testified at the hearing, as did vocational expert Julie Svec.  (*Id.*).  On February 28, 2014, the ALJ issued a written decision finding that Rotondo is not disabled.  (Tr. 19-39).  On July 1, 2015, the Appeals Council denied review.  (Tr. 1-5).  Rotondo timely filed for judicial review of the final decision on September 1, 2015.  (Doc. #1).

### B.    Framework for Disability Determinations

Under the Act, SSI is available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in

the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps ….  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### C.    Background

#### 1.    Rotondo's Reports and Testimony

At the time of the administrative hearing, Rotondo was 43 years old, and at 5'4" tall, weighed 132 pounds.  (Tr. 51).  She lived in a mobile home with her two children, a fifteen-year-old daughter, and a twenty-three-year-old daughter with cerebral palsy.  (Tr. 51, 209).  She completed tenth grade and later earned a certificate in "advocacy."  (Tr. 52-53, 186).  Previously, she worked at a gas station for approximately three years, first as a cashier and later as a manager.  (Tr. 54-55).  Rotondo has not worked since July 30, 2010, when the gas station owner informed her "there was not room for [her]."  (Tr. 54-55, 185).  She alleges disability since January 4, 2011; since 2010, however, she has been paid by the state of Michigan to care for her disabled adult daughter.  (Tr. 53-54, 185).

Rotondo alleges disability as a result of back pain and depression.  (Tr. 185).  She was diagnosed with a herniated disc at L4-L5 and, after conservative treatment failed, underwent

back surgery in February 2013.  (Tr. 56, 62).  She continued to follow up with her surgeon through June of 2013, and he was impressed with her progress, saying that she was "doing very well."  (Tr. 63).  Just before the administrative hearing, Rotondo began treating at a pain clinic, where she was advised to "just take it easy" and "do what you can."  (Tr. 64-65).  She testified that she still experiences back pain, which runs down her left leg to the knee.  (Tr. 82).  At the time of the hearing, Rotondo was taking several medications, including Xanax, Celexa, Cymbalta, Neurontin, and Zanaflex, Naprosyn.  (Tr. 66, 242).  She testified that the medications help with her back pain, but they cause side effects, such as difficulty sleeping and "memory issues."  (Tr. 66-67).

Rotondo testified that she can sit for about 2 ½ hours at a time, walk for two or three hours in an eight-hour day, stand for three hours in an eight-hour day, and lift up to eight pounds.  (Tr. 84-86).  She is able to drive but does so infrequently.  (Tr. 52, 86, 212).  She is able to perform various household chores, including folding laundry, loading the dishwasher, straightening the house, dusting, and cleaning counters.  (Tr. 70, 211).  She is able to prepare simple meals and snacks, do exercises on an exercise ball, and bathe and dress independently.  (Tr. 68, 70, 74-75, 211-12).  Rotondo also testified that she is able to care for her daughter with cerebral palsy, who requires assistance with bathing, brushing her hair, brushing her teeth, taking medications, and feeding.  (Tr. 68, 73, 210).  She further indicated that she suffers from rare panic attacks and has difficulty concentrating (for example, she no longer reads books, choosing instead to read short articles).  (Tr. 76-77, 81).

2. *Medical Evidence*

a. *Physical Impairments*

As the ALJ noted, a July 12, 2011 MRI of Rotondo's lumbar spine revealed a mild

4

central subligamentous disk herniation at L5-S1, mild thecal sac effacement without nerve root compression or effacement, and mild facet arthritis at L4-L5 and L5-S1.   (Tr. 313-14). Subsequently, Rotondo treated with Daniel Mekasha, M.D., who provided her with three epidural steroid injections between August and September 2011.  (Tr. 287-91).  On September 27, 2011, Rotondo followed up with Dr. Mekasha, reporting "a decrease in her back pain" following the injections, but continued bilateral leg pain.  (Tr. 295).  On examination, Rotondo was unable to walk on her toes due to weakness in her right lower extremity, but her lumbar range of motion was within normal limits, her straight leg raising was normal and pain-free, her reflexes were normal throughout, there was no evidence of sensory deficits, and she maintained a normal gait, station, and coordination.  (Tr. 296).  Rotondo was diagnosed with degenerative disc disease and lumbago, referred to physical therapy, and advised to consider surgical intervention. (Tr. 297).  At her next visit to Dr. Mekasha, on October 26, 2011, Rotondo reported low back pain radiating into the right hip, thigh, and leg.   (Tr. 298).   Her physical examination was essentially unchanged; her diagnoses were the same; and she was continued on the same medications (Neurontin, Norco, Motrin, Robaxin, and Citalopram).  (Tr. 298-300).

On December 20, 2011, Rotondo began primary care at Henry Ford Woodhaven, complaining of chronic back pain and requesting narcotic medication.  (Tr. 332-34).  She reported lifelong depression as well, for which she was taking Celexa and Xanax.  (Tr. 332).  She further reported being "offered surgery" by a neurosurgeon, saying she declined because she could not take time off.  (Id.).  On examination, her lower back was tender on palpation, but she had full strength in the lower extremities and intact sensation.  (Tr. 333).

Rotondo returned to Dr. Mekasha on February 3, 2012, complaining of continued radiating back pain.  (Tr. 301).  She admitted some relief from the previous injections, saying

that she "may have aggravated her pain by overexertion," and she requested more injections. (*Id.*).  On examination, she had lumbar tenderness, but full range of motion, normal straight leg raising, normal reflexes, and no sensory deficits.  (Tr. 302).  Rotondo saw Dr. Mekasha again on March 2, 2012, following a series of injections that "worked for a short period of time" before the pain returned; however, she admitted to not following the recovery rules she was given.  (Tr. 304).  Examination revealed mild tenderness with palpation over the lumbar spine and a positive straight leg raising test bilaterally, but her deep tendon reflexes were normal and her lower extremity strength was intact.  (Tr. 305).  Dr. Mekasha renewed Rotondo's medications and suggested the possibility of another series of injections if there was no improvement within a month.  (*Id.*).  On March 23, 2012, Rotondo underwent an injection at the right sacroiliac joint. (Tr. 286).  She returned to see Dr. Mekasha on April 3, 2012, indicating that she had "done well since the injection" and was able to ambulate more.  (Tr. 307).  Her examination was unchanged, and Dr. Mekasha renewed her medications and scheduled her for more injections, which were performed in April and May 2012.  (Tr. 255-60, 308).

In the spring of 2012, Rotondo presented twice to the emergency room at Henry Ford Wyandotte Hospital.  The first time was on April 16, 2012, when she complained of chronic low back pain.  On examination, she had right lower paraspinal tenderness and muscle spasm, but she maintained normal range of motion, motor strength, and sensation.  (Tr. 279).  She was diagnosed with exacerbation of chronic low back pain and prescribed Valium and Norco before being discharged.  (*Id.*).  A few weeks later, on May 1, 2012, Rotondo returned to the emergency room, complaining of back, arm, ankle, and hip pain following a fall that occurred when she tripped over uneven pavement.  (Tr. 263).  On examination, she had right paraspinal tenderness,

but maintained normal range of motion in the spine, full upper and lower extremity strength, and intact sensation.  (Tr. 264).

On May 22, 2012, Rotondo returned to see Dr. Mekasha, complaining of left knee weakness, low back pain radiating into the right leg, and poor sleep due to pain.  (Tr. 310).  On examination, she had lumbar tenderness, slightly reduced lower extremity strength (4/5), and was unable to walk on her toes due to right lower extremity weakness.  (Tr. 311).  However, her lumbar range of motion was within normal limits; her straight leg raising was normal and pain-free; her deep tendon reflexes were normal; there was no evidence of sensory deficits; and she maintained normal gait and station.  (*Id.*).  Her diagnoses remained unchanged, and Dr. Mekasha made no medication changes.  (*Id.*).

On July 24, 2012, Rotondo underwent evaluation with William Athens, Jr., D.O. at Precision Orthopedics, at which time she reported some improvement with the epidural injections she had been receiving.  (Tr. 319).  Her examination was normal, with no muscle weakness, no pain on internal or external rotation, and no neurological deficits.  (*Id.*).  Dr. Athens diagnosed Rotondo with degenerative disc disease and herniated nucleus pulposus, central at L5-S1, causing radicular symptoms.  (*Id.*).  He discussed surgery as an option, but noted that Rotondo would be at high risk for a pseudoarthrosis and non-union because she was a long-time smoker.  (*Id.*).

On August 8, 2012, Rotondo again sought emergency treatment at Henry Ford Wyandotte Hospital for low back pain.  (Tr. 421).  Examination revealed tenderness and decreased range of motion, but she had no pain with straight leg raising, and her reflexes, motor functioning, and sensation were all intact.  (Tr. 422).  On September 21, 2012, Rotondo returned to her primary care physician's office, complaining of severe back pain and requesting additional

Norco, saying she had used up her prescription early to treat a toothache. (Tr. 338). On September 24, 2012, however, Rotondo's PCP documented the fact that no more narcotics or controlled substances would be prescribed from that office. (Tr. 340). Two days later, Rotondo returned to the emergency room, again complaining of back pain. (Tr. 416). She was given morphine and Valium, but other than some pain with straight leg raising, her physical examination was generally normal. (Tr. 418-19). On October 25, 2012, Rotondo returned to the emergency room for back pain after she slipped and fell while mopping the floor. (Tr. 409). On examination, she had lower back tenderness and pain with straight leg raising on the right, but she maintained normal strength, sensation, and extremity range of motion. (Tr. 411). A cervical spine CT and lumbar films were negative; she was diagnosed with cervical radiculopathy and lumbar back pain and instructed to follow up with her primary care physician. (Tr. 412).

Rotondo returned to Dr. Mekasha on December 12, 2012, complaining of increased lower back pain. (Tr. 320). She reported some relief with prior injections but indicated she had to cancel the last one because of a family situation. (*Id.*). On examination, she had a positive straight leg raising test, but there was no lumbar tenderness, and her reflexes, strength, sensation, and gait were all normal. (*Id.*). Dr. Mekasha diagnosed degeneration of intervertebral disc and lumbago and prescribed Percocet and Soma. (*Id.*).

On December 29, 2012, Rotondo returned to the emergency room, saying she exacerbated her low back pain while shoveling snow. (Tr. 405). Examination revealed low back tenderness, pain with straight leg raising, and a staggering gait; however, she maintained normal range of motion in the upper and lower extremities. (Tr. 407). She was given morphine and discharged. (Tr. 408). A few days later, on January 2, 2013, she returned to the emergency

8

room, this time complaining of right hip pain.  (Tr. 400).  Although her physical examination was normal, she was given Toradol and Norco and discharged.  (Tr. 401-03).

Rotondo returned to Dr. Mekasha on January 10, 2013, again complaining of low back pain (which had decreased somewhat) and saying that she was "considering getting a second opinion about surgical intervention."  (Tr. 321).  On examination, she had some lumbar spine tenderness to palpation and positive straight leg raising on the left, but her strength, sensation, reflexes, and gait were all normal.  (*Id.*).  Rotondo returned to the emergency room twice more that month – on January 28 and 30, 2013 – complaining of low back pain radiating into the legs.  (Tr. 391-99).  Each time, she had some lumbar tenderness, but normal range of motion, reflexes, and sensory functioning.  (Tr. 393, 397-98).  Each time, she was given Dilauid and Valium and discharged.  (Tr. 395, 399).

On February 5, 2013, Rotondo was admitted to observation at Henry Ford Wyandotte Hospital.  (Tr. 372).  On February 6, 2013, she underwent an evaluation with Norbert Roosen, M.D. for low back and lower extremity pain.  (Tr. 370-71).  On examination, she had extreme low back tenderness and tenseness and positive straight leg raising bilaterally; however, she maintained normal strength and sensation.  (*Id.*).  Dr. Roosen noted that her recent MRI showed a significantly increased focal disc extrusion, as compared to a prior study from December 30, 2012, and he recommended surgery.[1]  (*Id.*).  On February 8, 2013, Dr. Roosen performed a decompression hemilaminotomy at L5-S1 with medial facetectomy at L5-S1.  (Tr. 388).

---

[1] The same day, Rotondo underwent a rehabilitation evaluation with Gregory Guyon, M.D.  (Tr. 372-75).  Dr. Guyon concurred that the disc extrusion appeared to be slightly larger than on the previous study, but he noted that there was no spinal canal stenosis and other areas of the spine looked good.  (Tr. 372).  He further noted that Rotondo had not had the opportunity for outpatient pool therapy or physical therapy, which he strongly recommended.  (*Id.*).  Dr. Guyon adjusted Rotondo's medications and administered injections.  (Tr. 374).

Rotondo was discharged on February 11, 2013, and was advised to lift no more than ten pounds until she followed up with Dr. Roosen. (Tr. 369).

On March 26, 2013, Rotondo returned to see Dr. Mekasha, indicating that the pain she had in her legs prior to surgery was gone, but she was having occasional tailbone pain.[2] (Tr. 322). Her physical examination was normal, however, with no lumbar spine tenderness, negative straight leg raising bilaterally, and normal gait, reflexes, sensation, and strength. (*Id.*). Dr. Mekasha increased Rotondo's medication for one month, since she was undergoing physical therapy. (*Id.*). The record indicates no further treatment for back pain until October 2013, when Rotondo's primary care physician diagnosed her with back pain, prescribed pain medication, and referred her to the pain clinic for injections. (Tr. 434-442). On December 16, 2013, Rotondo apparently underwent a redo L5-S1 discectomy and hemilaminotomy. (Tr. 476-77).

### b. *Mental Impairments*

On July 3, 2013, Rotondo presented to the emergency room, complaining of depression, anxiety, and increased panic attacks. (Tr. 362). Psychiatric examination revealed an anxious affect and tearfulness, but she was fully oriented, with normal insight, judgment, memory, and concentration.[3] (Tr. 364). She was diagnosed with generalized anxiety disorder and advised to continue Celexa and Xanax. (*Id.*).

On August 9, 2013, Rotondo began treating with Lee Anne Horn, CNP at Henry Ford Behavioral Health, complaining of depression, sleep problems, decreased concentration, and decreased energy. (Tr. 468). On examination, she had a sad mood and congruent affect, but she was alert, oriented, and cooperative, with good eye contact, appropriate dress, good grooming,

---

[2] On March 25, 2013, Rotondo underwent a physical therapy evaluation. (Tr. 443-50). Notably, however, she was noncompliant with physical therapy, as she cancelled one subsequent appointment and failed to show for another. (Tr. 452).

[3] Rotondo's back examination was normal at this hospital visit. (Tr. 364).

and normal thought process.  (Tr. 469).  Ms. Horn assessed Rotondo with depression, mood disorder, and generalized anxiety disorder and assigned her a Global Assessment of Functioning ("GAF")[4] score of 65.  (Tr. 470).

### 3. Vocational Expert's Testimony

Julie Svec testified as an independent vocational expert ("VE") at the administrative hearing.  (Tr. 87-92).  The ALJ asked the VE to imagine a hypothetical individual of Rotondo's age, education, and work experience who can perform sedentary work with the following additional limitations:  only frequent balancing, stooping, kneeling, crouching, and crawling; only occasional climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; and limited to unskilled work.  (Tr. 88-91).  The VE testified that the hypothetical individual would not be capable of performing Rotondo's past relevant work as a cashier or convenience store manager.  (Tr. 28).  However, the VE further testified that the hypothetical individual would be capable of working in the jobs of document preparer (500 jobs in the state of Michigan), weight tester (400 jobs), and addresser (500 jobs).  (Tr. 91).

### D. The ALJ's Findings

At Step One of the five-step sequential analysis, the ALJ found that Rotondo has not engaged in substantial gainful activity since May 31, 2012 (the application date).  (Tr. 21).  At Step Two, the ALJ found that Rotondo has the severe impairments of degenerative disc disease and depression.  (*Id.*).  At Step Three, he found that Rotondo's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment.  (Tr. 22).

The ALJ then found that Rotondo retains the residual functional capacity ("RFC") to

---

[4]  GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations.  *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

11

perform unskilled, sedentary work with the following additional limitations:  only frequent balancing, stooping, kneeling, crouching, and crawling; only occasional climbing of ramps and stairs; and no climbing of ladders, ropes, or scaffolds.  (Tr. 24).

At Step Four, the ALJ determined that Rotondo is unable to perform her past relevant work.  (Tr. 37).  At Step Five, the ALJ concluded, based in part on the VE's testimony, that Rotondo is capable of performing a significant number of jobs that exist in the national economy.  (Tr. 38-39).  As a result, the ALJ found that Rotondo is not disabled under the Act.  (Tr. 39).

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486

12

F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion'").

### F.     Analysis

#### 1.     The ALJ's Conclusion that Rotondo Does Not Have a Listing Level Impairment is Supported by Substantial Evidence

Rotondo argues that the ALJ erred in finding at Step Three that her impairments do not meet or medically equal Listing 1.04(A) and/or 1.04(C), asserting that the ALJ "never evaluate[d] the medical evidence…" (Doc. #16 at 12-15). The Court disagrees.

a.      The ALJ's Obligation at Step Three

Rotondo bears the burden of proving that her impairments meet or medically equal a particular listing. *See Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §404.1525(a). In other words, a claimant who meets or medically equals the requirements of a listed impairment will be deemed conclusively disabled. *See Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165, at *2 (6th Cir. Apr. 1, 2011). "A claimant must satisfy all of the criteria to meet the listing." *Rabbers,* 582 F.3d at 653.

In this case, the ALJ found, in relevant part, that Rotondo has the severe impairment of degenerative disc disease. (Tr. 21). He then went on at Step Three to consider whether this impairment, whether considered alone or in combination with other impairments, meets or medically equals a listed impairment. In doing so, the ALJ explicitly considered whether Rotondo's impairment satisfied Listing 1.04's requirements:

> In particular, the medical evidence does not satisfy the criteria of listing 1.04 (musculoskeletal disorders of the spine), as the record is absent evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in the requisite findings, such as ineffective ambulation, significant motor weakness, or other necessary abnormalities. Imaging conducted in February 2013 revealed evidence of a large central to left paracentral focal disc extrusion at L5-S1 contacting the bilateral S1 nerve roots, which had worsened since an earlier examination in December 2012. However, said test revealed no evidence of spinal canal stenosis, and the other areas of the spine appeared normal. In addition, although the record contains evidence of chronic low back pain, frequent pain with straight leg raising, occasionally reduced lower extremity strength, and occasional gait abnormalities, the claimant maintains intact sensation, and examinations have generally revealed normal range of motion, full strength, and a normal gait with independent ambulation. In addition, despite the occasional gait abnormalities, the claimant does not require an assistive device for ambulation. Therefore, the record fails to demonstrate

14

> the requisite threshold diagnostic findings and functional deficits for musculoskeletal disorders of the spine, and listing 1.04 is not met.

(Tr. 22-23 (citations omitted)).   Again, Rotondo's sole argument on this issue is that, in conducting his Step Three analysis, the ALJ "never evaluate[d] the medical evidence" and instead purportedly merely concluded that "generally listing 1.04 is not met because the record indicates that the record is absent from any criteria that the listing requires."   (Doc. #16 at 12). Rotondo's argument lacks merit.

It has been recognized that, "The Sixth Circuit has consistently rejected a heightened articulation standard, noting … that the ALJ is under no obligation to spell out 'every consideration that went into the step three determination' or 'the weight he gave each factor in his step three analysis,' or to discuss every single impairment."   *Staggs v. Astrue*, 2011 WL 3444014, at *3 (M.D. Tenn. Aug. 8, 2011) (quoting *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006)).   The *Staggs* court further stated, "Nor is the procedure so legalistic that the requisite explanation and support must be located entirely within the section of the ALJ's decision devoted specifically to step three; the court in *Bledsoe* implicitly endorsed the practice of searching the ALJ's entire decision for statements supporting his step three analysis."   *Staggs, supra*, at *3 (citing *Bledsoe, supra*, at 411); *see also Smith v. Comm'r of Soc. Sec.*, 2012 WL 4897364, at *6 (E.D. Mich. Sept. 14, 2012).   In this case, as discussed below, the plain language of the ALJ's decision, read in its entirety, makes clear that the ALJ thoroughly considered and discussed the evidence supporting his Step Three finding, and that his conclusion at Step Three is supported by substantial evidence.

b.      *Substantial Evidence Supports the ALJ's Step Three Finding*

In her brief, Rotondo asserts that she meets the requirements of both Listing 1.04(A) and

1.04(C).  (Doc. #16 at 12-15).  Listing 1.04(A) contemplates disorders of the spine, including

degenerative disc disease, which result in compromise of a nerve root or the spinal cord with:

> Evidence of nerve root compression characterized by neuro-anatomic
> distribution of pain, limitation of motion of the spine, motor loss (atrophy
> with associated muscle weakness or muscle weakness) accompanied by
> sensory or reflex loss and, if there is involvement of the lower back,
> positive straight-leg raising test (sitting and supine) . . . .

20 C.F.R. Pt. 404, Subpt. P, App'x 1, §1.04(A).  In comparison, Listing 1.04(C) requires:

> Lumbar spinal stenosis resulting in pseudoclaudication, established by
> findings on appropriate medically acceptable imaging, manifested by
> chronic nonradicular pain and weakness, and resulting in inability to
> ambulate effectively, as defined in 1.00B2b.[5]

20 C.F.R. Pt. 404, Subpt. P, App'x 1, §1.04(C).  As set forth above, contrary to Rotondo's

argument, the ALJ explicitly considered these listings in his decision, concluding that Rotondo

fails to satisfy the criteria of either.  (Tr. 22-23).  To the extent that Rotondo argues that the

ALJ's analysis was insufficient, or that he was required to explain his conclusions in greater

detail, such an argument fails.

With respect to Listing 1.04(A), the ALJ specifically found that the record "is absent

evidence of nerve root compression" (Tr. 22), and Rotondo, both in her brief and at oral

argument, pointed to no evidence to the contrary.  Indeed, Rotondo's July 2011 lumbar spine

MRI revealed a mild central subligamentous disk herniation at L5-S1 and mild thecal sac

---

[5] The regulations provide that, "Inability to ambulate effectively means an extreme limitation of
the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's
ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined
generally as having insufficient lower extremity functioning (see 1.00J) to permit independent
ambulation without the use of a hand-held assistive device(s) that limits the functioning of both
upper extremities."  20 C.F.R. Part 404, Subpt. P, App. 1 § 1.00(B)(2)(b)(1).

16

effacement <u>without nerve root compression or effacement</u>.  (Tr. 313-14).  Similarly, her February 2013 MRI revealed a large central to left paracentral focal disc extrusion at L5-S1 which contacted (but did not compress) the nerve roots.[6]  (Tr. 372).  Moreover, even considering the fact that Rotondo's straight leg raising tests were positive on occasion (*e.g.*, Tr. 205, 320, 321), she has failed to point to evidence of at least two other independent requirements of Listing 1.04(A):  limitation of motion of the spine and sensory or reflex loss.  Indeed, the ALJ noted throughout his decision multiple occasions on which Rotondo was found to have normal range of motion of the spine, normal reflexes, and intact sensation.  (Tr. 27-33 (citing Tr. 264, 279, 296, 298-300, 302, 305, 311, 320, 321, 322, 333, 393, 397-98, 411)).  At oral argument Rotondo did not refute the foregoing evidence and conclusions, and the ALJ's conclusions in this regard were not at all "bizarre" or indicative of "bias."  (Doc. #16 at 15).  Given all of these facts, the ALJ's conclusion that Rotondo does not meet Listing 1.04(A) is supported by substantial evidence.

Similarly, with respect to Listing 1.04(C), the ALJ properly noted that the record is absent evidence of lumbar spinal stenosis, as well as the other requisite findings of ineffective ambulation and chronic weakness.  (Tr. 22).  Dr. Guyon specifically noted that Rotondo had no spinal canal stenosis (Tr. 372), and Rotondo has not argued otherwise.  Listing 1.04(C) also requires evidence of pseudoclaudication, and at oral argument Rotondo admitted that there is no mention of this condition in the record.  And, as the ALJ noted, Rotondo was generally found to

---

[6] Rotondo asserts that she "clearly" meets this prong of Listing 1.04(A) "because clearly [she] has distribution of pain …."  (Doc. #16 at 15).  Courts have recognized however, that where, as here, the objective medical evidence affirmatively shows that there is no nerve root compression, a plaintiff cannot meet her burden at Step Three by relying on symptoms – such as radiating pain – that sometimes suggest nerve root compression.  *See Miller v. Comm'r of Soc. Sec.*, 848 F. Supp. 2d 694, 709 (E.D. Mich. 2011) ("An implication, based on radiating pain, is not enough to satisfy the Listing.").

have normal gait and full strength.[7]  (Tr. 22, 27-33 (citing Tr. 264, 279, 296, 298-300, 305, 311, 319, 320, 321, 322, 333, 411, 418-19)).  Again, then, the ALJ's conclusion that Rotondo does not meet or medically equal[8] Listing 1.04(C) is supported by substantial evidence.

### 2.    The ALJ's RFC Finding is Supported by Substantial Evidence

Rotondo also argues that the ALJ erred in finding that she retains the RFC to perform a reduced range of sedentary, unskilled work.  (Doc. #16 at 10-12).  In reaching this conclusion, the ALJ pointed to numerous facts contained in the record, all of which support his conclusion that Rotondo's limitations were not as disabling as she alleged.  For example, the ALJ noted that, although Rotondo was limited to lifting no more than ten pounds following her February 2013 surgery, this limitation was temporary in nature.  (Tr. 37 (citing Tr. 369)).  The ALJ further noted that the record contained no opinion as to any permanent restrictions imposed by any treating

---

[7] In her motion for summary judgment, Rotondo faults the ALJ for his Step Three finding, asserting that he "never discusses [her] numerous falls and resulting visits to the emergency room or the fact that after her last surgery she needed a wheelchair to ambulate …."  (Doc. #16 at 15).  As an initial matter, Rotondo provides no citation to the record in support of this argument, which does not satisfy her burden to show that a Listing was met.  *See Johnson v. Comm'r of Soc. Sec.*, 2012 WL 1019594, at *9 (E.D. Mich. Feb. 28, 2012) ("[T]here is a notable lack of citation to any record evidence to support plaintiff's claims of error …. [P]laintiff cannot simply … leave it to the Court to scour the record to support these claims.").  Moreover, there is no evidence that Rotondo required a wheelchair after her "last surgery" (in December 2013) (Tr. 476-77); and, after her first surgery (in February 2013), doctors were encouraging daily ambulation within three days (Tr. 368).  Additionally, two of Rotondo's three documented falls do not suggest an inability to ambulate effectively, as one occurred when she was walking on a wet floor she had just mopped, and the other occurred when she was shoveling snow and slipped on the ice.  (Tr. 406, 409-10, 413, 446).  Finally, on March 25, 2013, Rotondo indicated in a Patient Intake form that that she had not experienced any recent falls or loss of balance.  (Tr. 445).  Thus, particularly considering the stringent definition of an "inability to ambulate effectively" contained in the regulations, *see supra* fn. 5, Rotondo's arguments about her difficulty ambulating are unpersuasive.

[8] Although Rotondo asserts in passing that "she clearly meets and/or equals listing 1.04" (Doc. #16 at 12), she fails to explain how she equals this listing, which is fatal to her argument.  *See Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) (holding that in order to establish medical equivalency, a claimant "must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.") (emphasis in original).

sources.   (Tr. 37).   As to this matter, the ALJ further explained that Rotondo's condition improved after treatment, and that her "most recent examinations of record in early 2013 revealed only mild findings, which suggests that [her] impairment is relatively well controlled with current treatment."   (Tr. 36).   Additionally, the ALJ pointed out that Rotondo's allegations of disability are inconsistent with her wide range of activities of daily living, including her paid work caring extensively for her disabled adult daughter.   (Tr. 35).

In the face of the ALJ's extensive RFC analysis, Rotondo appears to raise four specific challenges.   First, she asserts that the ALJ failed to properly evaluate her "severe complaints of pain."   (Doc. #16 at 10).   Elsewhere in her motion, Rotondo likewise asserts that the ALJ made "no attempt to evaluate" her subjective complaints in accordance with the factors set forth in Social Security Ruling ("SSR") 96-7p.   (*Id.* at 11).   SSR 96-7p provides that, when a complaint of pain is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, he must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record" to determine if the claimant's claims regarding the level of her pain are credible.   *Soc. Sec. Rul.* 96-7, 1996 WL 374186, *1 (July 2, 1996); *see also* 20 C.F.R. §404.1529.   Essentially, then, Rotondo challenges the ALJ's credibility determination.

As the Sixth Circuit has held, however, determinations of credibility related to subjective complaints of pain rest with the ALJ because "the ALJ's opportunity to observe the demeanor of the claimant 'is invaluable, and should not be discarded lightly.'"   *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981) (quoting *Beavers v. Sec'y of Health, Ed. &*

*Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)).  Thus, an ALJ's credibility determination will not be disturbed "absent compelling reason."  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).

In this case, after finding at Step Two that Rotondo suffers from severe mental and physical impairments (Tr. 21), the ALJ concluded that she nevertheless retains the RFC to perform a reduced range of unskilled, sedentary work (Tr. 24-37).  In reaching this conclusion, the ALJ specifically considered Rotondo's "rather extensive" activities of daily living (including performing household chores, caring for her disabled adult daughter, and preparing meals); her medication treatment; treatment other than medication; and "other factors" (such as her sporadic work history, the fact that she is paid by the state to care for her daughter, and the fact that she did not adhere to recommended treatment), and he gave good reasons for discrediting Rotondo's allegations of work-preclusive limitations.  (*Id.*).  Thus, the ALJ fully complied with SSR 96-7p. *See, e.g., Lang v. Comm'r of Soc. Sec.*, 2012 WL 3224137, at *13 (E.D. Mich. Mar. 29, 2012) (ALJ is not required to explicitly discuss each of the factors set forth in SSR 96-7p in order to evaluate the credibility of a claimant's complaints of pain).

Second, Rotondo asserts that, "The ALJ does not include any non-exertional limitations related to the pain, which is bizarre considering the Plaintiff's well documented pain symptoms and non-exertional limitations."  (Doc. #16 at 10).  This is simply incorrect, as the ALJ limited Rotondo to only frequent balancing, stooping, kneeling, crouching, and crawling; only occasional climbing of ramps and stairs; and no climbing of ladders, ropes, or scaffolds.  (Tr. 24).  *See Soc. Sec. Rul.* 85-15, 1985 WL 56857, at *2 (Jan. 1, 1985) (nonexertional limitations include most mental limitations, as well as limitations in the ability to kneel, stoop, and crouch).

Rotondo next argues that, "There is not one non-exertional limitation related to the severe mental impairment of depression which is clear legal error."  (Doc. #16 at 10).  Later in her

motion, however, Rotondo inconsistently asserts that, "The only mental limitation the ALJ found in his RFC is 'unskilled work.'" (*Id.* at 11). Indeed, the ALJ specifically limited Rotondo to unskilled work to account for her mental impairment. (Tr. 36). In doing so, he referenced her GAF scores of 65, which indicate only mild symptoms or difficulties; the fact that she did not begin formal mental health treatment until August 2013; the fact that mental status examinations "have yielded only minimal findings"; and the fact that the record contains no evidence of inpatient treatment for psychiatric concerns. (Tr. 34, 36). Given these facts, the ALJ's decision to limit Rotondo to unskilled work to accommodate her mental impairment is supported by substantial evidence.

Finally, Rotondo argues that the ALJ did not comply with SSR 96-8p, which she claims requires a "function-by-function analysis of an individual's capabilities." (Doc. #16 at 11). The Sixth Circuit has explicitly rejected this argument, however, stating as follows: "[T]he Third Circuit stated, 'Although a function-by-function analysis is desirable, SSR 96-8p does not require ALJs to produce such a detailed statement in writing …. [T]he ALJ need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record.'" *Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547 (6th Cir. 2002) (quoting *Bencivengo v. Comm'r of Soc. Sec.*, 251 F.3d 153 (table) (3d Cir. Dec. 19, 2000)). Here, then, where the ALJ provided a detailed, thorough and fair discussion of the record evidence, and considered the impact of that evidence on Rotondo's ability to perform work-related activities, the Court finds the RFC analysis sufficient.

For all of the above reasons, and upon an independent review of the entire record, the Court concludes that the ALJ's decision is supported by substantial evidence.

**III.    CONCLUSION**

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [18] be GRANTED, Rotondo's Motion for Summary Judgment [16] be DENIED, and the ALJ's decision be AFFIRMED.

Dated: May 12, 2016                         s/David R. Grand
Ann Arbor, Michigan                        DAVID R. GRAND
                                           United States Magistrate Judge


**NOTICE TO THE PARTIES REGARDING OBJECTIONS**

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above.  *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1).  Failure to timely file objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have.  *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  Copies of any objections must be served upon the Magistrate Judge.  *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1).  Any such response should be

concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 12, 2016.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager